UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 00-5
(CA-99-937-S)

Anthony Grandison,

Petitioner - Appellant,

versus

Thomas Corcoran, etc., et al.,

Respondents - Appellees.

O R D E R

The court amends its opinion filed July 24, 2000, as follows:

On the cover sheet, section 4 -- the word "ARGUED" is added before the June 9, 2000, date.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ANTHONY GRANDISON,
Petitioner-Appellant,

v.

THOMAS CORCORAN, Warden of the
Maryland Correctional Adjustment

No. 00-5

Center and the Maryland
Penitentiary; J. JOSEPH CURRAN, JR.,
Attorney General of the State of
Maryland,
Respondents-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-99-937-S)

Argued: June 9, 2000

Decided: July 24, 2000

Before MURNAGHAN, WILKINS, and WILLIAMS,
Circuit Judges.

_____

Dismissed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mary Elizabeth Davis, DAVIS & DAVIS, Washington,
D.C., for Appellant. Annabelle Louise Lisic, Assistant Attorney Gen-

eral, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees. **ON BRIEF:** Christopher M. Davis, DAVIS & DAVIS, Washington, D.C., for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On May 22, 1984, a Maryland jury convicted Anthony Grandison of the first-degree murders of David Scott Piechowicz and Susan Carol Kennedy. After Grandison's original death sentences were vacated by a state post-conviction court, he was again sentenced to death after a sentencing jury found that his conduct, which included hiring an associate to kill Piechowicz and Kennedy, satisfied Maryland's "murder for hire" aggravating circumstance. After exhausting all available state remedies, Grandison petitioned the United States District Court for the District of Maryland for relief. See 28 U.S.C.A. § 2254 (West 1994 and Supp. 2000). The district court denied his petition and refused to issue a certificate of appealability. Grandison appeals, raising numerous challenges to the state court proceedings. Because we conclude that he has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C.A. § 2253(c)(2) (West Supp. 2000), we deny his application for a certificate of appealability and dismiss his appeal.

I.

The Maryland Court of Appeals summarized the underlying facts in this case in Grandison's direct appeal from his convictions and the death sentences he received at his original sentencing proceeding:

2

According to the State's evidence, [Vernon Lee Evans] and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000 from Grandison for performing the murders.

David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC-11 machine pistol. Nineteen bullets were fired at the victims, who died from multiple gunshot wounds.

Grandison v. State, 506 A.2d 580, 585-86 (Md. 1986) (Grandison II) (internal quotation marks omitted).

On June 30, 1983, Grandison was indicted and charged in the Circuit Court for Baltimore County with the first-degree murders of Piechowicz and Kennedy, conspiracy to commit murder, and the use of a handgun in the commission of a felony of violence.**1** While awaiting trial on the state charges, Grandison was convicted in federal court on both narcotics charges and witness tampering charges brought against him in connection with the murders. Grandison, electing to represent himself, was then tried before a jury on the state charges and found guilty on all counts. For the murder counts, he received two death sentences.

Grandison appealed the convictions and the death sentences, and the Maryland Court of Appeals affirmed. See Grandison v. State, 506 A.2d 580 (Md. 1986) (Grandison II).**2** On November 1, 1990, Grandi-

_____

**1** Before trial, the case was removed to Somerset County.

**2** In Grandison v. State, 481 A.2d 1135 (Md. 1984) (Grandison I), the Maryland Court of Appeals took an interlocutory appeal from the trial

son filed a petition seeking post-conviction relief in the Circuit Court for Somerset County. That court granted relief, ordering that Grandison receive a new sentencing hearing because defects in the sentencing form used at the first sentencing hearing may have, in violation of <u>Mills v. Maryland</u>, 486 U.S. 367 (1988), prevented the jurors from considering all relevant mitigation evidence.

On May 11, 1994, before the start of Grandison's resentencing hearing in Somerset County, Grandison advised the resentencing court that he wished it to appoint new counsel for him, arguing that he and his counsel had an irreconcilable disagreement as to how his defense should be conducted. After conducting an extensive <u>in camera</u> discussion with both Grandison and his attorneys, Messrs. William Purpura and Arcangelo Tuminelli, about counsels' planned defense, the resentencing court found that Grandison had no meritorious reason to discharge counsel and that it would not appoint new counsel for him. The court informed Grandison that his continued insistence on discharging his counsel would result in him having to proceed pro se. Despite the resentencing court's frequent statements to Grandison about the importance of being represented by competent counsel and its requests that Grandison reconsider the wisdom of his decision, Grandison maintained that his counsel should be discharged and replaced. Thus, after noting that Grandison clearly understood the nature of the proceedings and the consequences of his decision to fire counsel, the court informed Grandison that, unless he secured counsel before the start of the resentencing hearing, which was to begin on May 19, he would have to proceed pro se.

Grandison represented himself at the resentencing hearing. At Grandison's request, the court appointed Tuminelli to be his standby counsel. On June 3, 1994, at the hearing's conclusion, the jury found the aggravating circumstance that Grandison had hired Evans to commit the murders and that that aggravating circumstance outweighed

_____

court's dismissal of Grandison's motion, made on the ground of double jeopardy, to dismiss the state prosecution. The Court of Appeals rejected Grandison's contention that the state prosecution violated double jeopardy because Grandison had already been convicted of witness tampering in relation to the murders in federal court. <u>See id.</u> at 1137-38. Grandison raises no issues regarding the decision in <u>Grandison I</u>.

4

the mitigating circumstances.**3** Accordingly, the jury imposed two death sentences on Grandison. On appeal, the Maryland Court of Appeals affirmed the sentences. See Grandison v. State, 670 A.2d 398 (Md. 1995) (Grandison III).

On July 10, 1997, Grandison, represented by current counsel, filed a second petition for post-conviction relief in the Circuit Court for Somerset County that raised over fifty challenges to his convictions and death sentences. The post-conviction court conducted an evidentiary hearing at which Grandison offered testimony from a psychologist and psychiatrist/neurologist in an attempt to develop evidence that he had severe mental problems that affected his competency during the resentencing hearing and could have served as the basis for a mitigation defense. The post-conviction court denied Grandison relief in a thorough memorandum and order dated June 29, 1998. The Maryland Court of Appeals then denied Grandison leave to appeal from the denial of post-conviction relief.

On April 5, 1999, Grandison filed a petition for a writ of habeas corpus in the United States District Court for the District of Maryland, raising over thirty challenges to his murder convictions and death sentences. In a published opinion, the district court denied the petition. See Grandison v. Corcoran, 78 F. Supp.2d 499 (D. Md. 2000). Grandison then requested the district court to issue a certificate of appealability as to several of the issues raised in his petition and to the issues of whether the district court should have afforded him an evidentiary hearing and whether District Court Judge Smalkin should have recused himself from consideration of the petition. On February 22, 2000, the district court denied the motion. Grandison now requests that we issue a certificate of appealability as to several of the

_____

**3** The jury unanimously found the mitigating circumstance that Grandison had not previously been convicted of, entered a plea of guilty or nolo contendre to, or been granted probation on stay of entry of judgment to, a charge of committing a crime of violence. One or more jurors found the mitigating circumstances that Grandison was unlikely to engage in further criminal activity that would pose a threat to society and that Grandison was "already serving life plus 31 years." (J.A. at 494.) The jury unanimously found that the aggravating circumstance of hiring Evans to commit the murders outweighed the mitigating circumstances.

5

issues raised before the district court, as well as the issue of whether the district court applied the appropriate standard of review, and that we grant him a writ of habeas corpus.

## II.

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A. § 2254(d)(1) (West Supp. 2000).[4] Recently, in Williams v. Taylor, 120 S. Ct. 1495 (2000), the Supreme Court provided guidance as to how to interpret 28 U.S.C.A. § 2254(d)(1), substantially affirming this Court's interpretation in Green v. French, 143 F.3d 865, 869 (4th Cir. 1998). The Supreme Court held that a state court decision is "contrary to" clearly established federal law, as determined by the Supreme Court, when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 120 S. Ct. at 1523. A state court decision rests on an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The Court stressed that the nature of the inquiry was objective: "[A] federal habeas court making the `unreasonable appli-

_____

[4] When a federal habeas petitioner challenges findings of fact made by a state court, a federal court cannot issue a writ unless the state's adjudication on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2) (West Supp. 2000). "[A] determination of the factual issues made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp. 2000). We are required to consider a challenge to a state court finding of fact only in regard to Grandison's argument concerning his competency to waive counsel and whether that waiver was knowing and voluntary, which we address in Part II.B.

6

cation' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.

The standard of review provided by 28 U.S.C.A. § 2254(d)(1), however, does not apply where a state court has not adjudicated a habeas petitioner's constitutional claims on the merits. As this court has noted, "[w]hen a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, . . . our review of questions of law and mixed questions of law and fact is de novo." Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999), aff'd, 120 S. Ct. 727 (2000).**5**

A.

Before applying the proper standard of review to Grandison's claims regarding the state proceedings, we must address Grandison's first contention: that the district court utilized an incorrect standard in regard to 28 U.S.C.A. § 2254(d)(1)'s "unreasonable application" clause. The district court considered and denied Grandison's habeas petition after the Supreme Court granted certiorari in Williams but before it handed down its decision. According to Grandison, the district court utilized an "unreasonable application" inquiry that was subjective, rather than objective. We note, however, that the district court specifically stated that, in order to "be on the cautious side" before the Supreme Court issued its decision in Williams, it would utilize the "unreasonable application" test

> adopted by the most liberal Circuit opinion interpreting Section 2254(d)(1), viz., Matteo v. Superintendent, 171 F.3d 877 (3d Cir.) (en banc), cert. denied, ---- U.S. ----, 120 S. Ct. 73, 145 L.Ed.2d 62 (1999) where the Third Circuit adopted an "objectively unreasonable" test, saying, "The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits,

_____

**5** In this case, only Grandison's claim that his right to due process was violated when one witness at his resentencing hearing improperly bolstered the testimony of another witness, see infra Part II.H.2, requires us to apply a de novo standard of review.

7

resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Id. at 889-90.

Grandison v. Corcoran, 78 F. Supp.2d 499, 502-03 (D. Md. 2000). Thus, the district court clearly stated that its "unreasonable application" inquiry would be an objective one. Moreover, Grandison does not point to, nor can we find, any evidence that the district court did not use an objective inquiry of the sort prescribed by the Supreme Court in Williams. Thus, we find Grandison's argument on this issue to be without merit, and we now turn to his claims regarding the state proceedings.

B.

Grandison's first claim regarding the state proceedings is that his waiver of counsel before his resentencing hearing was not knowing and voluntary and that he was not competent to waive that right. In regard to the issue of whether the waiver was knowing and voluntary, Grandison claims that even though the Maryland Court of Appeals decided that his waiver was knowing and voluntary in Grandison III, see 670 A.2d 398, 412 (Md. 1995), the state post-conviction court6 should have reconsidered the issue in light of the testimony of the two doctors who testified before it that Grandison was suffering from mental impairments at the time of the resentencing.

In Godinez v. Moran, 509 U.S. 389 (1993), the Supreme Court held that a defendant's waiver of counsel, in order to be valid, must meet two criteria: The defendant's waiver must have been knowing and voluntary, and the defendant must have been competent to make the waiver. See id. at 400. The Court explained that "the purpose of the `knowing and voluntary' inquiry . . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision was uncoerced." Id. at 401 n.12. "The focus of the competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings." Id. "Requiring that a criminal defendant be

_____

6 From this point on, references to "the state post-conviction court" are to the court that denied Grandison's second petition for post-conviction relief, not the court that granted his first one.

8

competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." Id. at 402.

Before reviewing the state courts' application of this standard to Grandison's case, it is important to review some of the testimony presented at the state post-conviction court's evidentiary hearing in regard to this issue. At that hearing, both Dr. Robert Levin, a psychologist, and Dr. Michael Knable, a neurologist/psychiatrist, testified on Grandison's behalf. Dr. Levin interviewed Grandison about his background and reported that Grandison had a history of substance abuse, depression, and hyperactivity. He also noted that, as a child, Grandison had been hit over the head with an ax. After administering a series of psychological and intelligence tests to Grandison, Levin formed the opinion that Grandison was of very low intelligence and that Grandison suffers from damage to the frontal, temporal, and parietal areas of his brain. Dr. Levin said that, as a result of this damage, Grandison finds it difficult to concentrate on surrounding events and to understand the consequences of his decisions. Dr. Levin believed that Grandison did not appreciate the fact that he was waiving his right to counsel when he discharged Purpura and Tuminelli eight days before the start of his resentencing hearing. According to Dr. Levin, Grandison was so fixated on his desire to discharge his attorneys that he simply did not understand that the consequence would be a waiver of his right to be represented by counsel.

Like Dr. Levin, Dr. Knable believed that Grandison suffered from mental problems. He also reported that Grandison had a history of substance abuse and that he had suffered from head trauma at an early age. Dr. Knable testified that, as a result of the neurological tests he performed on Grandison, he believed that Grandison had suffered from both attention deficit hyperactivity disorder and non-progressive dementia. Grandison's dementia, according to Dr. Knable, made him exercise poor judgment, have poor concentration, and not be able to predict the consequences of his actions. Dr. Knable offered the opinion that these facts would have undermined Grandison's ability to make a rational decision to waive his right to counsel.

The State offered the testimony of Baltimore County psychiatrist Dr. Michael Spodak, who stated that Grandison was competent to decide to discharge his attorneys and proceed pro se. Dr. Spodak said

9

that, according to his review of the May 11, 1994 transcript, Grandison was aware that he was being offered the choice of retaining his counsel, discharging them and proceeding pro se, and discharging them and retaining his own counsel before the resentencing hearing. According to Dr. Spodak, Grandison may have been unhappy with those choices, but he understood them. Dr. Spodak stressed that Grandison's exchanges with the resentencing court and witnesses indicated that he fully understood the nature of the proceedings and was able to assist in his defense.

Dr. Spodak acknowledged that his findings contradicted the test results offered by Dr. Levin and Dr. Knable, but he stated that

> the true test of your ability and whether [a mental] impairment spills over into any issues of competency, in my opinion, is how you do in the actual field, the battle so to speak, which in this case would be the courtroom. And notwithstanding the description of problems that were in these test data, when you look at Mr. Grandison's performance he seemed to remember things from minute to minute. He seemed to be on focus and on target about certain issues.

(J.A. at 799.)

In placing greater weight on the findings of Dr. Spodak than those of Dr. Levin and Dr. Knable, the state post-conviction court observed that Dr. Levin had failed to review any of the pleadings, briefs, or letters that Grandison filed with the court. It noted that Dr. Knable had failed to review Grandison's many legal writings, was unaware that Grandison had represented himself in court in the past, had failed to talk to Grandison's past attorneys, and had not extensively reviewed the resentencing transcripts.

The state post-conviction court also noted that Dr. Spodak's testimony was reinforced by that of Tuminelli and Purpura. Purpura testified that he found Grandison to be an intelligent and capable client: "Mr. Grandison was extremely articulate on legal issues that involved him. He was well up to date on cases." (J.A. at 876.) Furthermore, "[Grandison] had a -- many practicing lawyers did not understand the Federal Rules of Evidence. Mr. Grandison understood the Federal

10

Rules of Evidence probably as good as, if not better, than most practicing lawyers in the federal court. And he understood them completely." (J.A. at 881.) Tuminelli testified that "[a]ll I can say is that in my contact with Anthony Grandison he appeared to be rational, intelligent, and competent and I didn't see a basis for trying to have him evaluated [by a mental health professional]." (J.A. at 872.)[7]

As noted earlier, Grandison raised the issue of whether his waiver of counsel at resentencing was knowing and voluntary on his direct appeal from that proceeding. The Maryland Court of Appeals found that Grandison had unambiguously waived his right to counsel, noting that he insisted on being appointed new counsel even after the resentencing court advised him that his position would result in the discharge of Tuminelli and Purpura. See Grandison III, 670 A.2d at 412.

According to Grandison, the state post-conviction court should have revisited the holding of the Maryland Court of Appeals that his waiver was knowing and voluntary in light of the testimony of Dr. Levin and Dr. Knable. This contention is without merit. Even though the state post-conviction court at first suggested that it would not revisit the finding by the Maryland Court of Appeals that the waiver was knowing and voluntary, it clearly considered Grandison's contention that he was incapable of understanding the consequence of his decision to request counsel, i.e., that his right to counsel would be waived unless he retained counsel before the start of the resentencing hearing. As already noted, the state post-conviction court credited the testimony of Tuminelli, Purpura, and Dr. Spodak over that of Dr. Knable and Dr. Levin in regard to Grandison's ability to understand the consequences of his decisions. The court also cited to portions of Grandison's verbal exchanges with the resentencing court during

_____

**7** These observations are reinforced by the resentencing court's statement to Grandison at the May 11, 1994 hearing that

> I know from reviewing all of the motions and petitions and listening to all of the arguments that you are indeed an intelligent gentleman with more than a passing knowledge of the law, so I don't have any problem finding that you can read and write and that you understand the law as it applies to . . . waiver of counsel.

(J.A. at 359.)

11

Grandison's attempt to secure the appointment of new counsel. In some of these exchanges, Grandison discussed the history of his case, discussed his Sixth Amendment right to counsel, marshaled cases in support of his legal arguments, and argued to the court that it needed to determine whether he had actually waived his right to counsel. After reviewing these exchanges, the state post-conviction court noted that "[t]hese are not the verbal exchanges of someone [who] is confused or unaware of the consequences of his actions."**8** (J.A. at 1043.) Grandison falls well short of offering any, much less clear and convincing, evidence that the factual findings made by the state post-conviction court on this issue are not entitled to a presumption of correctness, see 28 U.S.C.A. § 2254(e)(1) (West Supp. 2000), and he certainly does not provide any evidence that he was somehow coerced into making the waiver. In light of the record before us, we believe that neither the decisions of the Maryland Court of Appeals nor the state post-conviction court rejecting this claim were contrary to, or an

_____

**8** On May 11, 1994, the day when Grandison discharged Tuminelli and Purpura, the resentencing court noted how Grandison was "fencing over words," trying to discharge his counsel by stating only that he wanted new counsel appointed and relying upon the semantic difference between that request and a request to discharge counsel. (J.A. at 370.) The resentencing court specifically found that, when Grandison asked for new counsel, he knew that he would be discharging Tuminelli and Purpura. On May 19, at the start of the resentencing hearing, the resentencing court noted for the record the many times that Grandison had been advised of his right to counsel. It then stated:"I think it's important that the Court make a finding that you fully understand the importance of counsel, of your right to counsel, and the Court finds that by discharging counsel without a meritorious reason, not having counsel present today, that you have waived your right to counsel." (J.A. at 397.) Grandison points out that, on May 11, the resentencing court, when inquiring as to whether he wished to discharge counsel, said that "[y]ou're not waiving any rights" (J.A. at 371); this statement, he argues, confused him into thinking that he was not waiving his right to counsel by discharging Tuminelli and Purpura. In light of the fact that Grandison, immediately after the court made that statement, specifically indicated his concern that if he rephrased his request to have new counsel appointed in terms of discharging his current counsel, he would be waiving his right to counsel, we discern no evidence of confusion on Grandison's part. Indeed, Grandison's statement indicates that he understood exactly the consequences of his decision.

12

unreasonable application of, clearly established federal law as determined by the Supreme Court. The decisions were also not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C.A. § 2254(d)(2) (West Supp. 1999).

We now turn to the issue of Grandison's competency to waive his right to counsel. The state post-conviction court clearly applied a competency standard consistent with that articulated by Godinez in order to determine that Grandison had the mental capacity to understand the nature of the proceedings at resentencing and to assist in his own defense. As support for its finding of competency to waive counsel, it looked to the understanding of the proceedings that Grandison demonstrated during his exchanges with the resentencing court before discharging his counsel, as well as the testimony of Tuminelli, Purpura, and Dr. Spodak, all of whom believed that Grandison was an individual who understood the nature of the proceedings at which he discharged counsel and was fully capable of assisting in his defense. Thus, the state post-conviction court's decisions rejecting this claim were not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.[9] The decision was also not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

_____

[9] Grandison notes that the Supreme Court has stated that "a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation," Godinez v. Moran, 500 U.S. 389, 400 (1993), and argues that the state post-conviction court erred by using Grandison's ability to represent himself as the sole ground for determining whether he was competent to waive his right to counsel. We think that it would be odd to read the Supreme Court's statement in Godinez, offered in the context of the observation that most defendants will represent themselves poorly without the aid of counsel, as saying that evidence of a defendant's strong abilities to represent himself cannot be used as a factor in determining competency. In any event, the state post-conviction court did not rely upon Grandison's ability to represent himself as the sole factor for determining competency to waive counsel. As noted above, it gave great weight to the testimony of Dr. Spodak, Tuminelli, and Purpura.

13

C.

Grandison's second claim regarding the state proceedings is that the resentencing court, in accepting Grandison's discharge of Tuminelli and Purpura, effectively denied him his Sixth Amendment right to counsel. In rejecting this claim, the Maryland Court of Appeals focused upon the fact that Grandison had no meritorious reason to discharge his counsel because, contrary to his assertion, the defense that Grandison wanted to present at resentencing was not inconsistent with the defense his counsel wished to present. The court noted that

> [t]he record supports the trial court's findings that the two defense theories were not irreconcilable and that Grandison tried to manufacture a conflict, for purposes of generating an appellate issue, where one did not exist. Both defense theories could have been presented without inconsistency. Evidence [supporting Grandison's defense theory] could have been presented leaving open to doubt whether Evans was the shooter. Further evidence [supporting counsels' defense theory] then could have been introduced suggesting that even if Evans was the shooter, he must have been hired by Rodney Kelly [a friend and criminal associate of Grandison], acting of his own accord, or by someone else, because Grandison knew the futility of such action vis-a-vis his pending federal prosecution [because Piechowicz and Kennedy had already given testimony that would be admissible if they were unavailable to testify.]

Grandison III, 670 A.2d at 411.

We can find no error in this logic.[10] We also note that, in light of

_____

[10] To the extent that Grandison wishes to use this argument to wage a backdoor attack on the issue of whether his waiver of counsel was voluntary, we note that "[a] refusal without good cause to proceed with able appointed counsel is a `voluntary' waiver." United States v. Gallop, 838 F.2d 105, 109 (4th Cir. 1988). In Part II.B of this opinion, we rejected Grandison's argument that the resentencing court's May 11, 1994 statement that "[y]ou're not waiving any rights" made his waiver of counsel unknowing and involuntary by confusing him. (J.A. at 371.) Here,

14

the fact that Grandison was competent to waive counsel and did so knowingly and voluntarily, it is difficult to understand how the resentencing court, which repeatedly reminded Grandison of the importance of counsel and asked him to reconsider his decision, somehow denied Grandison his right to counsel.**11** Thus, the decision of the Maryland Court of Appeals rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

D.

Grandison's third claim regarding the state proceedings is that, under the Supreme Court's decision in <u>Dusky v. United States</u>, 362 U.S. 402 (1960) (per curiam), he was incompetent to represent himself at the resentencing hearing. He states, correctly, that in <u>Dusky</u>, the Supreme Court "held that the standard for competence to stand trial is whether the defendant has `sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has `a rational as well as factual understanding of the proceedings against him.'" <u>Godinez</u>, 509 U.S. at 396 (quoting <u>Dusky</u>, 362 U.S. at 402). He fails to note, however, that in <u>Godinez</u>, the Supreme Court held that the standard for whether a defendant is competent to stand trial is the same as the standard for whether he is competent to waive counsel. <u>See id.</u> at 397-98. In other words, the competency standard articulated by <u>Godinez</u> is the same as that articulated by <u>Dusky</u>. <u>See id.</u> at 398 (rejecting "the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the <u>Dusky</u> standard"). The state

_____

Grandison appears to make the fantastic suggestion that the resentencing court used the confusion created by this statement to deprive him of his Sixth Amendment right to counsel. Because we have already rejected the contention that Grandison was confused by the resentencing court's statement, we necessarily reject this argument.

**11** In light of our determination that Grandison's resentencing counsel were not ineffective, <u>see infra</u> Part II.E, Grandison's suggestion that the resentencing court deprived him of his Sixth Amendment right to counsel by forcing him to choose between ineffective counsel and no counsel at all is without merit.

15

post-conviction court used the same facts and legal standard to determine that Grandison was competent to represent himself at resentencing as it did to determine that he was competent to waive his right to counsel. We have already concluded that its decision concluding that Grandison was competent to waive counsel does not run afoul of the standard of review provided by 28 U.S.C.A. § 2254(d)(1). Thus, it necessarily follows that the state post-conviction court's decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

E.

Grandison's fourth claim regarding the state proceedings is that he received ineffective assistance of counsel at resentencing. Specifically, he contends that Tuminelli and Purpura, whom he discharged eight days before the resentencing hearing began, failed to investigate and develop mitigation evidence regarding his alleged mental health problems. He asserts that, if only his counsel had investigated these problems so that the resentencing jury, which sentenced him to death on the basis of Maryland's "murder for hire" aggravating circumstance, could have considered them, the jury would not have sentenced him to death.[12]

In order to prevail on his claim of ineffective assistance of counsel, Grandison must show (1) that his attorneys' actions, in light of all the

_____

[12] Maryland's "murder for hire" aggravating circumstance reads as follows: "The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration." Md. Ann. Code art. 27, § 413(d)(7) (Supp. 1998). Maryland provides two categories of mitigating circumstances into which evidence of mental problems on the part of a defendant might fall: (1) "The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance;" and (2) "Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." Md. Ann. Code art. 27, § 413(g)(4) and (8) (Supp. 1998).

16

surrounding circumstances, were professionally unreasonable, i.e., "outside the wide range of professionally competent assistance," Strickland v. Washington, 466 U.S. 668, 690 (1984); and that (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

When applying the first prong of the Strickland test, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted). Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. "In other words counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. "In any ineffective assistance case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Also important to keep in mind is that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information . . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Id.

17

With these familiar principles in mind, we address Grandison's claim that Tuminelli and Purpura were ineffective.**13** The state post-conviction court found that this claim was without merit, noting that there was simply no indication on the record that Tuminelli and Purpura were aware, or should have been aware, of any alleged mental problems that could be used as mitigation evidence. As noted during our discussion of Grandison's claim that he was not competent to waive counsel and that his waiver was not knowing and voluntary, see supra Part II.B, both Tuminelli and Purpura testified that they found Grandison to be an intelligent and articulate client. Tuminelli's overall assessment of Grandison's performance as a client bears repeating: "All I can say is that in my contact with Anthony Grandison he appeared to be rational, intelligent and competent and I didn't see a basis for trying to have him evaluated [by a mental health professional]." (J.A. at 872.) As the state post-conviction court noted, even Dr. Knable, who testified on Grandison's behalf, said that the non-progressive dementia with which he diagnosed Grandison "would not be clear to the general public." (J.A. at 717.) **14**

Moreover, as the state post-conviction court noted, Grandison did not want his counsel to present any defense that alleged he was suffer-

_____

**13** As the district court noted, it is questionable whether Grandison should even receive the benefit of a review of Tuminelli's and Purpura's performance under Strickland v. Washington, 466 U.S. 668 (1984), as Grandison discharged his attorneys eight days before the start of his resentencing hearing, thus not giving them a chance to represent him in the courtroom. In any event, as our discussion of this claim indicates, Grandison's claim cannot survive the Strickland test.

**14** Grandison's assertion that Tuminelli and Purpura should have suspected mental problems because Grandison had sometimes refused to take their advice and frequently discharged counsel in the past is tantamount to the suggestion that attorneys should always characterize the stubbornness of a strong-willed client as a mental impairment. Grandison also notes that he told Dr. Levin that he suffered from migraine headaches, and that Tuminelli and Purpura should have recognized these headaches as a sign of mental impairment. Even if we accept the dubious contention that Grandison's migraine headaches should have put Tuminelli and Purpura on notice of an alleged mental impairment, we note that neither Tuminelli nor Purpura could recall that Grandison ever complained of any headache problems.

18

ing from a mental impairment. Tuminelli testified that "[i]n addition we never had any reason, that I have no recollection of ever thinking that Mr. Grandison had some kind of deficiency. But even if he did, I mean, there were limitations on what kind of defense was acceptable to Mr. Grandison." (J.A. at 857.) Also relevant is that, according to Tuminelli, one of Grandison's prior attorneys, Phil Dantes, had been fired specifically because he had suggested using mental health evidence in Grandison's defense. Grandison states that he never directly instructed Tuminelli and Purpura not to pursue a mental-health mitigation defense; this assertion, however, is contradicted by the following portion of Tuminelli's testimony: "And Mr. Grandison made clear and the information we had from Capital Defense and from Mr. Dantes was that [a mitigation defense based upon mental impairment] was not open to discussion." (J.A. at 857.) Moreover, as noted earlier, Tuminelli and Purpura had planned, at resentencing, to pursue a defense in regard to the "murder for hire" aggravating circumstance that, even if Evans was the triggerman, Grandison did not order or offer to pay for the shooting because he was familiar enough with the rules of evidence to know that the Piechowiczs' prior testimony from motion hearings and grand jury proceedings could be admitted against him at trial in the event of their death. Surely, as a strategic matter, offering evidence of a debilitating mental impairment would have been inconsistent with, and detrimental to, that line of defense, which would have relied upon Grandison's strong mental abilities. In these circumstances, we fail to see how Tuminelli and Purpura could have been placed on notice that they needed to investigate questions about Grandison's alleged mental impairments as they prepared for resentencing. As the state post-conviction court noted, Grandison felt such a defense to be unacceptable, and his behavior was that of an intelligent and articulate individual. Grandison thus fails to meet the first prong of the Strickland test;[15] this failure obviates the need for us to

_____

[15] Grandison also asserts that counsel would have been unprepared to go forward with resentencing even if he had not discharged them. We note that, before the state post-conviction court, Purpura testified that had he and Tuminelli not been discharged, they were prepared to present both their and Grandison's defense theories. They also planned to argue that the jury should take into consideration that life without parole was a better alternative than the death penalty and that Grandison was working to have a positive relationship with his family, particularly his children, while he was in prison.

19

consider the second prong.**16** The state post-conviction court's decision rejecting Grandison's claim of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

F.

Grandison's fifth claim regarding the state proceedings is that the resentencing court violated his constitutional rights by denying him a continuance after he had discharged his counsel at the May 11, 1994 hearing. A trial court has broad discretion with respect to the decision to deny a continuance. See Morris v. Slappy, 461 U.S. 1, 11-12 (1983).**17** A trial court's denial of a continuance will violate a defendant's Sixth Amendment right to counsel only when the trial court displays "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Id. (internal quotation marks omitted).**18**

_____

**16** While Grandison's claim fails on the first prong of the Strickland test, the state post-conviction court was certainly correct to note that Grandison was aware that he had suffered head trauma as a child and could have presented that fact at the resentencing hearing. To the extent that Grandison wished to present evidence about his background, including his difficult childhood, at resentencing, nothing prevented him from doing so. Thus, Grandison is hard-pressed to show any prejudice under Strickland's second prong.

**17** Although Morris dealt with the situation where a habeas petitioner claimed that substitute counsel did not have enough time to prepare for trial, we have applied it in the situation where the petitioner says that he, acting as a pro se defendant, did not have enough time to prepare for trial because of the trial court's refusal to grant a continuance. See, e.g., United States v. Lawrence, 161 F.3d 250, 254 (4th Cir. 1998).

**18** While the substantive argument on this issue offered in Grandison's brief alleges a violation of the Sixth Amendment, Grandison makes the scattershot assertion that the denial of the continuance also violated his rights under the Fifth, Fourteenth, and Eighth Amendments without offering any arguments as to how his rights under those amendments were violated. No matter what rights Grandison claims were violated, Grandison's claim must fail in light of the determination by the Maryland Court of Appeals that Grandison had plenty of time to prepare for his resentencing hearing after he discharged counsel.

20

This claim is patently frivolous. As the Maryland Court of Appeals pointed out when it rejected this claim, "Grandison had eight days to prepare for the proceeding, which was a resentencing rather than an original sentencing in which he might be unfamiliar with the evidence." See Grandison III, 670 A.2d at 426. That court also noted that

> [t]he record also reflects that Grandison had spent the vast majority of his time in prison since 1983 poring over transcripts of the initial sentencing hearing and the applicable law. The eight-day period before the sentencing proceedings provided Grandison with ample time in which to summons witnesses and familiarize himself with the relevant facts and law that he had previously researched.

Id. In light of this analysis, we cannot say that the decision of the Maryland Court of Appeals rejecting Grandison's claim on this issue was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

G.

Grandison's sixth and seventh claims regarding the state proceedings involve Maryland's "murder for hire" aggravating circumstance, which the resentencing jury found present in his case and used to sentence him to death. The following is the statutory definition of Maryland's "murder for hire" aggravating circumstance: "The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration." Md. Ann. Code art. 27, § 413(d)(7). Grandison argues that the aggravating circumstance violates the Eighth Amendment and that an error in the resentencing court's jury instructions in regard to that circumstance violated his right to due process. We address these claims in turn.

1.

First, Grandison claims that Maryland's "murder for hire" aggravating circumstance does not adequately narrow the class of murderers eligible for the death penalty, and, thus, violates the Eighth

21

Amendment. Grandison notes that his first-degree murder convictions rested upon the fact that he murdered Piechowicz and Kennedy through a murder contract, and that the "murder for hire" aggravating circumstance made him eligible for the death penalty because of the same contract. He then uses this fact to assert that, in his case, the death-eligible class of persons is the same size after sentencing as it was at the end of the guilt/innocence phase of his trial.

On direct appeal from Grandison's resentencing, the Maryland Court of Appeals rejected this claim, correctly relying upon the Supreme Court cases of Lowenfield v. Phelps, 484 U.S. 231, 244-46 (1988), and Tuilaepa v. California, 512 U.S. 967, 972 (1994), for the proposition that the Eighth Amendment is not violated because an aggravating circumstance is contained within a crime's definition. See Grandison III, 670 A.2d at 409. In Tuilaepa , the Court indicated that an aggravating circumstance sufficiently narrows the class of death-eligible murderers so long as it does "not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder." Tuilaepa, 512 U.S. at 972. Here, as the Maryland Court of Appeals noted, there is no question that Maryland's "murder for hire" aggravating circumstance narrows the death-eligible pool of murderers, as not every person convicted of first-degree murder will have taken out a murder contract on his victims. Thus, this claim is without merit. The decision of the Maryland Court of Appeals rejecting Grandison's claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

2.

Second, Grandison claims that there was an error in the jury instructions given at his resentencing hearing in regard to the "murder for hire" aggravating circumstance that violated his right to due process. The resentencing court instructed the jury that, in order to find the presence of the "murder for hire" aggravating circumstance, it had to find beyond a reasonable doubt that he agreed to pay someone to commit the murder. Grandison contends, however, that the resentencing court should have adopted his proposed instruction that, in order to find the presence of the aggravating circumstance, the jury had to find that Evans was the one who actually committed the murders.

22

The Supreme Court has stated that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "The question in such a collateral proceeding is whether the ailing instruction by itself so infected the trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." Id. (internal quotation marks and citations omitted).

Keeping these familiar principles in mind, it is apparent that Grandison's claim on this issue is without merit. As the Maryland Court of Appeals noted when it considered this question in Grandison III, the jury instruction proposed by Grandison was clearly an incorrect statement of law. See 670 A.2d at 417. Under Maryland law, "[p]roof of the aggravating circumstance required only a showing that Grandison engaged someone to commit the murders and that the murders were committed pursuant to an agreement or contract for remuneration or promise thereof." Id. (citing Md. Ann. Code art. 27, § 413(d)(7)). Thus, as the Maryland Court of Appeals noted, an instruction that Evans was the triggerman was not necessary under Maryland law.[19] See id. In addition, that court observed that "Grandison's proposed instruction . . . was fairly covered by an instruction actually given":

> As the State's evidence consisted only of evidence that Evans was the shooter, the court's general instruction regarding the jury findings necessary to reach a conclusion that the aggravating circumstance had been proven would have precisely the same effect as the more specific instruction Grandison requested -- that the jury could not find the aggravating factor proven unless it also found that Evans had committed the murders.

_____

[19] To the extent that Grandison alleges that the given instruction was incorrect under Maryland law, that allegation is not a cognizable basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

23

Id.

In these circumstances, it is impossible to say that the instruction given to the resentencing jury on the "murder for hire" aggravating circumstance was an error that so infected the trial that the imposition of Grandison's death sentences violates due process. Thus, the decision of the Maryland Court of Appeals rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

H.

Grandison's eighth and ninth claims regarding the state proceedings involve testimony offered by FBI Agent Kevin Foley, who testified at the resentencing hearing about his investigation into the murders at the Warren House Motel. Grandison alleges that perjury and impermissible bolstering of another witness by Foley violated his right to due process. We address these claims in turn.

1.

First, Grandison alleges that, at resentencing, the prosecution knowingly allowed Agent Foley to perjure himself on the stand. At the hearing, Foley testified as to the reasons why Grandison became the focus of the FBI's investigation into the murders. In giving his reasons, Foley stated that the Piechowiczs were scheduled to testify against Grandison; that Janet Moore, Grandison's girlfriend, had previously threatened Cheryl Piechowicz; and that "also on one prior occasion a witness had been injured against Mr. Grandison." (Supp. J.A. at 1-2.) Grandison says that this last reason was false and that Foley and the prosecution knew it to be false.

A conviction acquired through the knowing use of perjured testimony by the prosecution violates due process. See Napue v. Illinois, 360 U.S. 264, 269 (1959); Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998), cert. denied, 525 U.S. 1150 (1999). "[K]nowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution." Id. The knowing use of perjured testimony constitutes a due process violation when "there is any reasonable likelihood that

24

the false testimony could have affected the judgment of the jury." Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) (internal quotation marks omitted).

In Grandison III, the Maryland Court of Appeals rejected Grandison's claim on this issue, stating that there was no evidence to "establish[ ] that Agent Foley's statement was false or that the prosecution deliberately elicited false testimony." 670 A.2d at 434. Grandison challenges this conclusion by pointing to a copy of an indictment against both him and Evans regarding their attempted murder of a man named Joseph Miller. According to the indictment, Grandison, in 1979, injured Miller, who was scheduled to testify against a criminal associate of Grandison's named Walter Webster in a federal narcotics case. (J.A. at 955.) Grandison argues, however, that because the witness he injured was scheduled to testify against Webster, not him, Agent Foley must have been lying, and that the prosecution knew he was lying. Even if we accept the dubious contention that the indictment, standing alone, shows that Foley knowingly presented false testimony and that the prosecution knowingly elicited false testimony, there is no reasonable likelihood that the statement could have affected the outcome of the resentencing hearing. First, the fact that Grandison injured any witness, including one scheduled to testify against someone else, would seem to be a good reason to have suspected Grandison in the murders of Piechowicz and Kennedy. Second, Foley's testimony as to why his initial investigation focused on Grandison mentioned two other important facts that Grandison does not challenge: The FBI knew that the Piechowiczs were scheduled to testify against Grandison and Janet Moore had threatened Cheryl Piechowicz. Third, and most importantly, the reasons that the FBI focused its investigation on Grandison are completely irrelevant to the evidence discovered by law enforcement officials during their investigation. The "murder for hire" aggravating circumstance was triggered by evidence that Grandison hired Evans to commit the murder, not by evidence as to why the investigation focused on Grandison. Thus, the decision of the Maryland Court of Appeals rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

2.

Second, Grandison claims that his right to due process was violated because the resentencing court allowed Agent Foley to bolster and

25

vouch for the testimony of Charlene Sparrow, Evans's girlfriend, who testified at the hearing that she assisted Evans in his preparation for the murder, that Evans came running out of the hotel after the murders and handed her the "smoking gun" used to kill the victims, that Evans told her that he had committed the murders, and that Evans told her that he would receive $9,000 from Grandison for committing the murders. Later in the hearing, the prosecution called Agent Foley to the stand, who, as part of his general discussion about the investigation, discussed his interviews with Sparrow. Grandison claims that the following portion of his testimony was an improper bolstering of Sparrow's testimony:

> [Prosecutor:] Agent Foley, let me end this questioning this way. There came a point in time of interviewing Charlene Sparrow where you were satisfied she was telling the truth, not based on strictly what she was telling you, but on other things that corroborated what she had told you.
>
> . . . .
>
> [Agent Foley :] Yes, that's correct. I was convinced she was telling me the truth and it was totally corroborated.

(J.A. at 448-49.)

The Maryland Court of Appeals rejected this claim on procedural grounds. See Grandison III, 670 A.2d at 420. Because, however, the state has not raised the issue of procedural default, it has waived it. We, therefore, review this claim de novo, as there has been no state "adjudication on the merits" deserving deference under 28 U.S.C.A. § 2254(d). See Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, . . . our review of questions of law or mixed questions of law and fact is de novo."), aff'd, 120 S. Ct. 727 (2000).

In the context of considering vouching and bolstering statements made by a prosecuting attorney during closing arguments, we have noted that "[w]hile vouching and bolstering are always inappropriate,

26

improper remarks during closing argument do not always mandate retrial. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997) (internal quotation marks and alterations omitted). The Sanchez court offered the following explanation as to how this question should be answered:

> In addressing a claim of improper vouching we must first decide whether the comments made in fact constituted vouching or bolstering. If so, we must next determine whether the comments prejudicially affected the defendant by considering (1) the degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention.

Id.

Even assuming that an allegedly bolstering statement by a witness should be held to the same standard as a prosecutor's statement, we believe that Foley's statement concerning Sparrow's credibility did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." Id. (internal quotation marks omitted). While Foley's statement about Sparrow's credibility is bolstering, it was isolated and clearly not made to divert the resentencing jury's attention. Grandison makes no attempt to explain how the statement could have misled the resentencing jury, and we are at a loss to see how it could have done so. Finally, for purposes of the resentencing jury's finding that the "murder for hire" aggravating circumstance applied to Grandison's case, the proof of Grandison's involvement in the murder plot as the man who hired Evans was certainly very strong without Agent Foley's bolstering statement at the resentencing hearing. Significantly, a trial jury, ten years before Foley made the statement, found Grandison guilty of first-degree murder in connection with the plot. Thus, Grandison's argument on this issue is without merit.

27

I.

Grandison's tenth claim regarding the state proceedings is that the Maryland death penalty statute is unconstitutional because it does not mandate a sentencing proceeding in which a jury's finding of an aggravating circumstance be bifurcated from the rest of the hearing. Grandison contends that, according to Gregg v. Georgia, 428 U.S. 153 (1976), the Eighth Amendment requires such a bifurcation. In Gregg, the Supreme Court expressed a preference for bifurcation of a capital defendant's sentencing hearing from the guilt/innocence trial. See id. at 190-91. Gregg does not, however, hold that the Eighth Amendment requires an internal bifurcation of the sentencing proceedings. Thus, the decision of the Maryland Court of Appeals rejecting this claim, see Grandison III, 670 A.2d at 424, was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

J.

Grandison's eleventh claim regarding the state proceedings is that Maryland's refusal to grant appellate review as of right to claims of ineffective assistance of counsel raised in post conviction hearings violates the Due Process Clause. The state post-conviction court rejected this argument, holding that it was foreclosed by the Fourth Circuit decision of Hunt v. Nuth, 57 F.3d 1327 (4th Cir. 1995). In that case, this Court rejected the same argument that Grandison makes on this issue, holding that Maryland's decision not to grant appellate review as of right does not violate the Due Process Clause. See id. at 1336. In relying upon Hunt, the state post-conviction court's decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

K.

While Grandison's other claims regarding the state proceedings have alleged constitutional violations in regard to his resentencing hearing, his remaining two claims involve alleged violations in his original trial and in his appeal from his conviction. First, he claims that the prosecution, in violation of Brady v. Maryland, 373 U.S. 83

28

(1963), withheld evidence at trial that would have impeached the credibility of two of its witnesses. Second, he alleges that his appellate counsel on his appeal from his conviction failed to raise this Brady issue properly. We address these arguments in turn.

1.

Grandison claims that, at trial, the prosecution failed to turn over an unredacted copy of an FBI report that summarized the testimony of Janet Bannister, an employee of the restaurant at the Warren House Motel who was in the lobby shortly before the murders took place. This report, he claims, is both favorable and material evidence whose suppression violated his right to due process. Before considering the details of his claim, we summarize the legal principles established by the Supreme Court in Brady and its progeny. A prosecutor's failure to disclose "evidence favorable to an accused . .. violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; see also Kyles v. Whitley, 514 U.S. 419, 433 (1995) (noting that there is no difference between situations in which a defendant requests disclosure and situations in which a defendant fails to make such a request). Evidence is favorable if it is exculpatory or if it could be used to impeach prosecution witnesses. See Strickler v. Greene, 527 U.S. 263, 280 (1999); United States v. Ellis, 121 F.3d 908, 914 (4th Cir. 1997). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See Kyles, 514 U.S. at 433 (internal quotation marks omitted). "A `reasonable probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Id. at 434 (internal quotation marks omitted).

According to the unredacted copy of the FBI report, Bannister was in the lobby of the Warren House Motel with her friend Mildred Talley around 3 p.m. on the day of the murders when she saw a black male dressed in a light-colored shirt ask Kennedy for change. Bannister then went to the parking lot to wait for an individual named Arthur Faulk to join her for lunch; during her wait, she spoke with two friends named Marie Valle and Mary Williams. After she and Faulk returned to the motel from lunch, the police were on the scene.

29

At his trial, Grandison was in possession of a redacted copy of the report that differed from the unredacted copy only in that the names and addresses of the people Bannister reported seeing, except Kennedy, were blacked out.

Grandison claims that the unredacted copy impeaches the testimony of Helen Kondilidis and Etta Horn, two witnesses who were at the motel on the afternoon of the shootings and who testified for the prosecution that they saw a man fitting Evans's description in the lobby shortly before the shootings.[20] According to Grandison, the unredacted copy shows that the only people in the hotel lobby at 3 p.m. were Bannister, Kennedy, Talley, and the black male who asked for change. At trial, Horn testified that it was "about a quarter of 3:00" when she saw Evans in the lobby, (J.A. at 103), and Kondilidis testified that it was around 3 p.m. when she saw Evans there. Thus, the argument goes, the unredacted FBI report shows that Kondilidis and Horn were not in the lobby at 3 p.m., as they claimed, and impeaches their credibility.

Fatal to this argument is the fact that the unredacted FBI report never records Bannister as saying that she, Kennedy, Talley, and the black male were the only persons present in the lobby. Bannister, according to the report, listed the presence of these individuals, but never stated or implied that they were the only ones present at around 3 p.m.[21] We note that, at trial, Grandison asserted that the unredacted report would show that "Helen Kondilidis was on the parking lot of the Warren House Hotel at the time that she testified that she was viewing Vernon Evans in the Warren House." (J.A. at 187.) The unredacted report never states or suggests that Bannister saw Kondilidis in the parking lot. Because the unredacted report could not have been used to impeach either Horn or Kondilidis, it is not favorable Brady

_____

[20] Horn worked as a member of the motel's housekeeping staff. Kondilidis frequently visited the motel, as her aunt owned the motel restaurant.

[21] Even if Bannister had purported to offer an exclusive list of those present at 3 p.m., it is difficult to see how that list would impeach Horn's testimony that it was fifteen minutes before three when she saw the individual matching Evans's description in the lobby. Also, Horn testified that she had seen the same individual several times earlier in the day.

30

evidence. It is also not material Brady evidence, as the fact that Grandison did not possess it at trial does not undermine our confidence in the jury's verdict. The parties argue over whether the prosecution was actually in possession of a copy of the unredacted report at trial. Because we conclude that the unredacted report was neither favorable nor material, we need not address this dispute. Accordingly, the decision of the Maryland Court of Appeals rejecting this claim, see Grandison II, 506 A.2d 580, 610-11 (Md. 1986), was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.**22**

2.

Grandison next claims that his appellate counsel on direct appeal from his conviction was ineffective because, even though she raised the Brady issue, she did not argue that, under Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964), police suppression of the unredacted FBI report is attributed to the prosecution even if the prosecution had no idea that the police had it. See id. at 846. Given our conclusion that the unredacted report was neither favorable nor material evidence, this claim, which, incidentally, contradicts Grandison's allegation that the prosecution had a copy of the unredacted report at trial, is without merit. Thus, the decision of the state post-conviction court rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

III.

Grandison's final two claims concern errors he alleges were committed by the district court. He argues that the district court erred in denying his motion for recusal and in denying his request for an evidentiary hearing. We address these claims in turn.

_____

**22** To the extent that Grandison argues that the unredacted report is exculpatory or impeaching because Bannister's description of the black male asking for change contradicts the descriptions given by Horn and Kondilidis, we note that the redacted copy, which Grandison possessed at trial, did not black out Bannister's description.

31

A.

Grandison claims that the district court judge should have recused himself from review of his habeas petition. The district court denied Grandison's motions for recusal and reassignment of the case. We review a district court judge's decision not to recuse himself for abuse of discretion. See United States v. DeTemple, 162 F.3d 279, 283 (4th Cir. 1998), cert. denied, 526 U.S. 1137 (1999). Grandison makes two arguments on this claim, both of which are wholly without merit. First, he argues that the district court judge should have recused himself because he was an acquaintance of Joseph Kennedy, a former security guard at the federal courthouse in Baltimore who was the father of Susan Kennedy. Second, he argues that the district court judge was not randomly assigned to consider his habeas petition. In other words, he suggests that there was a conspiracy to make sure that a particular district court judge was assigned to consider his petition so that it would be denied.

Grandison's first argument must fail, as he alleges no facts that would allow us to conclude that the district court judge's acquaintance with Joseph Kennedy was a source of significant extrajudicial prejudice or bias that is necessary for this claim to succeed. See Liteky v. United States, 510 U.S. 540, 554-55 (1994). Indeed, all he offers is the conclusory allegation that, because the district court judge knew Joseph Kennedy, he must have been biased against Grandison. This conclusory allegation is not enough to support Grandison's claim. See Cauthon v. Rogers, 116 F.3d 1334, 1336 (10th Cir. 1997) (stating that conclusory allegations, standing alone, are not sufficient to state a recusal claim); United States v. $292,888.04 in U.S. Currency, 54 F.3d 564, 566 (9th Cir. 1995) ("[M]ere conclusory allegations . . . are insufficient to support a claim of bias or prejudice such that recusal is required." (internal quotation marks omitted)); In re Kaminski, 960 F.2d 1062, 1065 n.3 (D.C. Cir. 1992) ("A judge should not recuse himself based upon conclusory, unsupported or tenuous allegations.").

Grandison's second argument fails because he alleges no facts that would support a conclusion that there was a conspiracy to make sure that the district court judge would be the judge who considered his habeas petition. In any event, there is absolutely no reason to suspect that the district court did not consider Grandison's petition in a fair

and impartial manner before denying it. The district court, therefore, did not abuse its discretion in denying Grandison's recusal motion.

B.

Grandison's final claim is that the district court erred in denying his request for an evidentiary hearing. He argues that such a hearing was needed in order for the district court to consider his claims of ineffective assistance of counsel, his Brady claim, and his claims regarding his waiver of his right to counsel. We review the district court's decision to deny Grandison an evidentiary hearing for abuse of discretion. See Thomas v. Taylor, 170 F.3d 466, 474-75 (4th Cir.), cert. denied, 527 U.S. 1016 (1999). In order to receive an evidentiary hearing on habeas review, Grandison must "allege[ ] additional facts that, if true, would entitle him to relief." Cardwell v. Greene, 152 F.3d 331, 338 (4th Cir.) (internal quotation marks omitted), cert. denied, 525 U.S. 1037 (1998). Grandison, who was given the opportunity to develop a factual predicate for his claims at a state post-conviction hearing, argues only that the state post-conviction court did not properly weigh the evidence he developed at the hearing or made incorrect decisions as a matter of law, not that the factual record needs to be better developed. Thus, the district court did not abuse its discretion in denying Grandison an evidentiary hearing.

IV.

For the reasons set forth above, we conclude that Grandison has failed to make a substantial showing of the denial of a federal constitutional right with respect to any of his assertions of error. Accordingly, we deny his request for a certificate of appealability and dismiss the appeal.

DISMISSED

33